UNITED STATES *v.* RICHARDS (No. 416).[1]

1. LEATHER BELTING.
    There is no uniform general trade meaning attached to the words "leather belting" confining it to that class of leather suitable in making belts for the transmission of power.

2. PICKER STRAP AND APRON LEATHER.
    The importation here of leather to be used in the manufacture of appliances in textile machinery, namely, picker strap and apron leather, falls properly within the description "belting leather" as used in tariff act of 1909; it includes equally leather suited to transmit power from wheel to wheel and leather suited simply to convey materials, and is dutiable as belting leather under paragraph 451 of that act.

United States Court of Customs Appeals, April 24, 1911.

APPEAL from a decision of the Board of United States General Appraisers, G. A. 7069
(T. D. 30793).
    [Affirmed.]

*D. Frank Lloyd,* Assistant Attorney General (*Charles D. Lawrence* on the brief), for the United States.
    *Searle & Pillsbury* (*Wm. E. Waterhouse* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, and DE VRIES, Judges.

DE VRIES, Judge, delivered the opinion of the court:

These importations are of leather. They are variously described upon the invoices as "green butts leather," used for making conveyor belts for wool-combing machines; "white butts," used principally for aprons in textile machinery; "one-half butts, dry chrome picker leather," chiefly sold for the manufacture of "picker bands" or "picker straps," which operate on rims or levers to throw the shuttles on looms; "light black English picker butts," of the same use as the picker bands; and "chrome bands," which are narrow bands used for covering the rims of certain wheels on textile machinery.

The importation in the greater part was of, and this controversy chiefly concerns, what are known as "apron leathers," which are leathers of a peculiar preparation for the purpose of being made into conveyors in worsted machines, so designed as to draw wool from the comb and transmit it to the coiler, the apron passing between rollers and being propelled by them.

Duty was assessed upon all the leathers by the collector at the port at Boston at the rate of 15 per cent ad valorem under the provisions of paragraph 451 of the tariff act of 1909, as "all other leather."

The importers contend that they are dutiable at 5 per cent ad valorem under the same paragraph as "Band, bend, or belting-leather."

The paragraph, in so far as we deem it pertinent, is as follows:

451. Band, bend, or belting leather, rough leather, and sole leather, five per centum ad valorem; dressed upper and all other leather, * * * fifteen per centum ad valorem; * * *.

The Board of General Appraisers sustained the protests. At the hearing before the board many witnesses testified, and the record is a voluminous one. The Government sought to establish that the term "belting leather," as used in the paragraph, was one of commercial designation, which referred to and included only a class of leather different from and excluding that of this importation. The importers introduced testimony tending to show that there was no such uniform and general commercial understanding, and that these importations were equally known as belting leathers in that they were used for conveyors and that such were belts.

It is agreed by all parties that the terms "band leather" and "bend leather" have no general and uniform commercial meaning other than or different from their descriptive signification.

In commenting upon the testimony the board made the following observations:

On the trial a large number of witnesses were examined and considerable feeling was evidenced by a number of them. Having had opportunity of hearing the witnesses and observing their manner and speech, it was impossible to escape the conclusion that, consciously or unconsciously, much of the testimony was biased along the lines of personal interest. This was more particularly true of several of the witnesses called on behalf of the Government than of those called on behalf of protestants, as is indicated more particularly by their refusal to express opinions on illustrative samples offered by protestants, on the ostensible ground that they were too small, and at the same time implying that such samples were not honestly representative of what they purported to represent, in that they had been "doctored" chemically. The record shows that several samples, no larger than those so referred to as being too small, were submitted by the Government to the same witnesses and passed upon without objection as to their size. No attempt was made to prove that any of protestants said illustrative samples had been "doctored," nor was any request made for opportunity to do so, but, on the contrary, it was later testified to on behalf of protestants, and not controverted, that the samples were honestly representative of the leathers from which they had been cut.

We have examined the record with great care, and feel that the criticism by the board was fully warranted, and particularly should have been given weight in the findings of fact. While some of the testimony on behalf of the Government was directed toward the use of a commercial meaning for the term "belting leather," the greater portion of that testimony was directed more to the point that these importations, by reason of their condition, were not suitable for certain belting purposes. The Government sought to confine the definition of a belt and of belting leathers to that suitable only for the purpose of transmitting power from wheel to wheel or axis to axis. It was asserted by the witnesses that the necessary characteristics of such belting leather were firmness, pliability, tensile strength, and freedom from stretching—qualities which might be present in apron leather, which they had characterized this importation, but in an entirely different degree, and that this importation did not possess

such qualities in a sufficient degree. It may be fairly said within the record that the great bulk of this importation is bought and sold as apron leather, which is leather suitable and intended to be used in the making of conveyors for the purpose of transporting materials and not power from point to point.

While there was, as stated by the general appraiser sitting, "singular uniformity" in the testimony of the witnesses on behalf of the Government that belting leather was only that suitable for use in making belts to transmit power from point to point, there was great variance in that testimony as to the requisite degree of firmness, pliability, tensile strength, and stretch necessary to include the merchandise in the term belting leather.

It is apparent and all the witnesses agreed that, whatever the use, these qualities vary in a great degree according to the amount of power to be conveyed and the conditions of use. It was further claimed that the oil content of the imported merchandise was properly indicative of a condition which rendered it unsuitable as belting leather. Likewise it was asserted by the Government witnesses that the chrome picker straps were too soft and liable to stretch in order to be suitable for belting leather.

In this connection, we quote from the standard authority, Procter, on "The Principles of Leather Manufacture," wherein he states:

Chrome leather belts should be kept thoroughly oiled. They have a much greater adhesion than vegetable tannages, and this is increased by oiling. Good chrome belting is much stronger than bark-tanned; and is unaffected by damp or steam, but generally stretches somewhat more.

All of which indicates that these qualities are not infallible guides.

Controverting the Government's case, the importers introduced equally qualified witnesses who testified that the term "belting leather" as used in trade and commerce was not confined to belts for the transmission of power, but includes also conveyor belts, used for the transmission of materials from point to point. In substantiation of this witnesses were introduced who produced catalogues of three different wholesale houses wherein were advertised conveyor belts. A larger number were offered on the same point, but their introduction was refused by the general appraiser sitting on the ground that "three were as good as a million."

From this record we think that it clearly appears that there is no uniform general trade meaning in this country attached to the words "leather belting" which confines it to that class of leather suitable for making belts for the transmission of power, and that the term as used by Congress is so used in its ordinary acceptation.

The question is whether or not this merchandise is included within the general scope of the terms "band, bend, or belting leather."

The term "band leather" is unknown to the leather trade. Having been inserted in the statute, it must therefore be given its natural

signification, which would be leather from which bands are made or leather prepared for making bands.

The testimony shows that a "bend *of* leather" is known in the leather trade. It refers to a section of the hide from which leather is made. Two "bends" make a "butt," and a butt is half a hide trimmed.

A "bend" is defined by the Oxford Dictionary as follows:

*Bend.*—A shape or size in which ox- or cow-hides are tanned into leather, forming half of a "butt."

"Bend-leather" as defined by the same authority is as follows:

*Bend-leather.*—The leather of a "bend," i. e., the thickest and stoutest kind of leather (from the back and flanks), used for soles of boots and shoes; sole-leather.

The Standard Dictionary, twelfth edition, gives essentially the same definition of a bend. "Bend-leather" is stated to be "sole-leather."

The Century Dictionary and Cyclopedia defines a "bend" as follows:

*Bend.*—A name in the leather trade for a butt or rounded crop cut in two; the half of a hide of sole-leather that was trimmed and divided before tanning.

Bend-leather as defined by the same authority is as follows:

*Bend-leather.*—The strongest kind of sole-leather for shoes.

"Bend" seems in the leather trade to refer to a section of the hide. "Bend-leather" seems to be confined to leather taken from the section of the hide called the bend. It is half of a butt and includes the main portions of the hide when rounded or trimmed.

Indeed some of the witnesses for the Government by inadvertent reference spoke of conveyors as "conveyor belts," and of "apron belts."

From an examination of the lexicographic definitions and the cited instances of the use of the words "band," "bend," and "belt," as known in the leather trade and in common parlance, together with their use in various acts of Congress from 1842 to and including the act of 1909, it would seem that they are essentially coextensive terms. All of the lexicographic authorities, in one place or another, use the words "band," "bend," and "belt" interchangeably when referring to certain senses of the use of these words. We do not find it necessary, however, in this case to attempt precise definitions of the words "band" and "bend" as used in the tariff act of 1909 and applicable to this importation.

The main contention below was that this merchandise was within the term "belting leather" as used in the act, and that was the ultimate conclusion of the Board of General Appraisers. In this we think the board did not err. This record convinces us that the term "belting leather" as used in the tariff act of 1909 was used in a descriptive

sense, and that in common nomenclature conveyor belts are equally belts with those for the transmission of power, and that the term "belting leather" as used in the tariff act of 1909 includes equally leather suitable for use as power and as transmission belts.

We are not unfamiliar with the common understanding of elevator belts used in grain and other elevators for the transmission of grains, and not power, from one point to another. The common use of the term in that sense finds a very minor expression in the case cited in the Oxford Dictionary from Harper's Magazine, where, in an article upon American flour mills, the expression is used, "It empties itself into conveyers consisting of small buckets travelling on an endless belt."

The letters patent of the particular conveyors in question, issued by the Patent Office at Washington, describe the precise article made from these importations as a "conveyor belt."

Whilst these very slight evidences are of small weight, they are nevertheless corroborative of what we deem the common understanding of that term.

It is no doubt true that in mechanics, and strictly speaking, a belt is confined to an instrument for the transmission of power, but that even is not confined to a leather belt, as all the lexicographic definitions will show. "Belt" is a generic term, the function of which differs greatly according to the use to which it is put. Primarily it is the well-known band around the waist, of whatever material composed; in its secondary sense it includes a band or strip, joined at the ends, usually longer than it is wide, and employed in a variety of purposes, such as belts in the primary sense above mentioned. Belts for the conveyance of power, and extending to and not excluding therefrom belts for the transmission from point to point of motion and materials, of which the articles for the manufacture of which these importations are the materials are a prominent, extensive, and well-understood class.

In United States *v.* Horrax (T. D. 31187; 1 Ct. Cust. Appls., p. 142) this court held that certain bands used in cigarette machines for the transmission of tobacco from point to point were belts. It was contended in that case that they were not such, because belts were used only for the transmission of power from point to point.

We can not see any reason for assigning to Congress a purpose of differentiation between the conveyor belt and a power belt, or the leather out of which they are made. The leather is essentially of the same character, made from the same grade and weight of hides, tanned in essentially the same process, but finished of varying degrees of flexibility, according to the particular use intended. In some cases the power belt is finished hard and stiff; in others soft and more pliable. In many instances they are interchangeable in use. Conveyor belts are of the softer and more pliable kind. They

are both for use by the same manufactures, and frequently, if not always, upon the same machine. They are made from the same class of hides and from the same part of the hide, always including, if not wholly of, the bend.

To hold otherwise than did the board here would be to adopt the finesse of scientific, mechanical differentiation rather than the plain, common understanding of terms used other than in a commercial sense.

While the words band, bend, and belting leather, from the somewhat uncertain lack of use of the words in that trade, can not in their application be fixed to a certainty, we think that the natural scope of these words is in exact accord with the manifest intention of Congress for almost a hundred years to classify and make dutiable at the same rate all grades of heavy bovine leathers which is indicated by the different tariff acts. We find nothing in this record which conduces to the conclusion that the Board of General Appraisers here erred either in the findings of fact or conclusions of law.

*Affirmed.*

MONTGOMERY, Presiding Judge, and SMITH and BARBER, Judges, concur.